UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
:
DANIEL PACELLI, :
:
Petitioner, :
: 20 Civ. 9431 (JPC)
-v- :
: OPINION
VANE LINE BUNKERING, INC., *doing business as* : AND ORDER
VANE BROTHERS, :
:
Respondent. :
:
-----------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Daniel Pacelli won an arbitration award against Vane Line Bunkering, Inc. (referred to as "Vane Brothers," the name under which the company does business) for injuries he sustained while working on a barge in New York Harbor. While the arbitrator concluded that the total award was nearly $1 million, he determined that Vane Brothers was responsible for only 30% of it because Pacelli was contributorily negligent.

Before the Court is Pacelli's petition to vacate this arbitration award. In the event that the Court declines to do so, Pacelli asks the Court to confirm the award he received (*i.e.*, the 30% that Vane Brothers must cover), which equals $296,025. Vane Brothers opposes vacatur but does not oppose confirmation of the award. For the reasons stated below, the Court denies Pacelli's petition to vacate the award and grants Pacelli's petition to confirm the award.

## I. Background

**A. Underlying Facts**

The following facts are undisputed and are taken from the Petition to Vacate Arbitration Award, Dkt. 1 (the "Petition" or "Pet."), and the arbitrator's Final Award, Dkt. 6 ("Skolnick

Declaration" or "Skolnick Decl."), Exh. A ("Award").

Pacelli worked as a tankerman for Vane Brothers, a company that "owned and operated barge and tugboat fleets in various parts of the country." Pet. ¶ 6; *see* Award at 3. In March 2017, he was working on a barge in New York Harbor. Pet. ¶ 7; Award at 4. The barge was scheduled to deliver fuel and oil to another ship on the morning of March 15, 2017. Award at 4.

On March 14, 2017, a nor'easter struck, which caused the harbor to shut down due to "frigid conditions." *Id.* at 5; *see also* Pet. ¶ 9. Pacelli worked the early morning shift that day from midnight to 6:00 a.m. Award at 5; *see also* Pet. ¶ 8. His boss, the barge's captain, Michael J. Mikus, told Pacelli, "they want to get as much product onboard before the blizzard hits." Pet. ¶ 10; Award at 5. When Pacelli pointed out that it had already started snowing, Captain Mikus responded, "Danny, I'm sorry. I don't know what to tell you." Pet. ¶ 10; Award at 5. Captain Mikus went to his room and shut the door. Pet. ¶ 10; Award at 5. Pacelli then filled the cargo tanks with 24,000 barrels of fuel and oil. Pet. ¶ 11; Award at 5. He finished his shift and went to sleep at 6:00 a.m. Pet. ¶ 11; Award at 5.

Pacelli returned to work at noon. Pet. ¶¶ 8, 12; Award at 5. At 12:20 p.m., the barge received word that it would be transported to a terminal at 6:00 a.m. the following morning to deliver the fuel and oil that Pacelli had loaded. Pet. ¶ 12. Captain Mikus and Pacelli shoveled snow on the barge that afternoon in order to make paths for a crew that was scheduled to arrive to transport the barge the next day. *Id.*; Award at 5. Pacelli finished his shift at 6:00 p.m. and went to bed. Pet. ¶ 12; Award at 5.

He started his next shift at midnight on March 15, 2017. Pet. ¶ 15; Award at 5-6. Because this shift was his last before a two-week break, Pacelli spent the first few hours performing "basic cleanup" to prepare the barge for the new crew. Pet. ¶ 15; Award at 6. At 3:00 a.m., Pacelli went

to throw his dirty mop water over the side of the barge, but noticed that the deck had "turned into a sheet of ice." Pet. ¶ 16; Award at 6. Pacelli anticipated that the lower deck's mooring lines, which were used to tie the barge to the dock, would have to be untied before the barge's departure a few hours later. Pet. ¶ 16. He thus decided to spread salt on the upper and lower decks in an effort to remove the ice. *See id.*; Award at 6.

A tugboat was positioned alongside the barge, in the ship's "notch." Pet. ¶ 17; Award at 6. Before placing salt on the decks, Pacelli attempted to get the attention of someone in the tugboat, but was unsuccessful. Pet. ¶ 17; Award at 6. He considered climbing into the tugboat to see if one of the crew members could help him salt the decks, but decided to do it himself. Pet. ¶ 17; Award at 6-7. He also did not wake Captain Mikus or wait for the new crew to arrive to assist him. Award at 7.

Pacelli retrieved several 50-pound bags of salt, poured the salt into a bucket, and spread the salt across the upper deck. Pet. ¶ 18; Award at 7-8. Salting the upper deck was easy because it was very wide. *See* Pet. ¶ 18; Award at 8. The lower deck, on the other hand, was much narrower, which made for a trickier task. *See* Pet. ¶ 18; Award at 8. According to Pacelli, the "best way" to salt the lower deck was to lean over the upper deck handrails and throw the salt onto the lower deck. Award at 8; *see also* Pet. ¶ 19. However, Pacelli could not use this method because he knew that the upper deck handrails needed maintenance. Pet. ¶ 19; Award at 8. He had previously told Captain Mikus that the cables affixing the handrails had broken, but Captain Mikus did not properly fix the problem or report it to anyone. Pet. ¶ 19; Award at 8-9. So Pacelli decided to go down to the lower deck to salt that area of the barge. Pet. ¶ 19; Award at 9.

While salting the lower deck, Pacelli kept his flashlight in his pocket. Pet. ¶ 20; Award at 9. At approximately 4:00 a.m., he slipped and landed on his left arm. Petition ¶ 21; Award at 10.

3

The grab rails on the lower deck were not fully accessible because they were covered by mooring lines. Petition ¶ 20; Award at 9. As he fell, Pacelli grabbed the deck hatch to avoid falling overboard. Petition ¶ 21; Award at 10. As a result of this accident, Pacelli "tore the rotator cuff on both of his shoulders, tore a bicep tendon on one arm and partially tore a bicep tendon on the other arm, and sustained herniation of cervical disks in the neck." Pet. ¶ 22; *see* Award at 17-19.

**B. Arbitration**

Pacelli brought a JAMS arbitration action against Vane Brothers. *See* Award at 2. On August 23, 2017, JAMS informed the parties that Ariel E. Belen had been appointed as the arbitrator. Skolnick Decl., Exh. G. That same day, JAMS provided the parties with a disclosure report, which indicated that JAMS did not have any prior or pending cases involving the parties. Pacelli's counsel, or Pacelli's counsel's law firm. *Id.*, Exh. I. However, the report disclosed that JAMS had one open case involving Vane Brothers' counsel and his law firm. *Id.* On March 13, 2019, JAMS informed the parties that Belen had been selected to serve as the arbitrator in another case involving Vane Brothers, its counsel, and its counsel's firm. *Id.*, Exh. J.

The arbitration hearing for Pacelli's case was held on September 23 and 24, 2019. *See* Award at 2. On December 5, 2019, the arbitrator sent a letter to the parties disclosing that he was an "owner panelist of JAMS" but had "never received a profit distribution of more than .1% of JAMS total revenue in a given year." Skolnick Decl., Exh. M. He said that he disclosed this in order "[t]o conform to recent case law." *Id.* The next day, JAMS sent the parties a document that disclosed that in the previous five years, JAMS had one open arbitration case, four closed arbitration cases, and one closed mediation with Vane Brothers; one open arbitration case and one closed arbitration case with Vane Brothers' counsel; and one open arbitration case and six closed mediations with Vane Brothers' counsel's law firm. *Id.*, Exh. N.

4

On January 8, 2020, after the submission of final post-hearing briefs, the arbitration was deemed closed. Pet. ¶ 35; *see also* Skolnick Decl., Exh. O at 12-13. According to Rule 24(a) of the JAMS Comprehensive Arbitration Rules & Procedures, the arbitrator was required to provide a final award within 30 days of this date. Skolnick Decl., Exh. O at 13. However, the arbitrator requested several extensions of this deadline, and all parties consented. *See id.*, Exhs. P-R. The arbitrator then scheduled oral argument to "seek clarity" on a few issues. *Id.*, Exh. S. At oral argument, the arbitrator stated he would issue a decision by June 30, 2020. *Id.*, Exh. FF. He sought several extensions of this deadline too, and no party objected. *Id.*, Exhs. HH-LL.

On August 14, 2020, the arbitrator issued the award. He determined that Pacelli was entitled to $986,750 based on the damages he sustained, and that Vane Brothers would be responsible for 30% of this. Award at 25. In reaching this decision, the arbitrator noted that Vane Brothers was negligent in several respects. First, he explained that Captain Mikus had "an obligation to ensure that the barge was safe and seaworthy and to protect his crew" and in light of the ice that had developed, "[h]e failed to do so." *Id.* at 12. Specifically, Captain Mikus did not hold a "Job Safety Analysis" meeting with Pacelli prior to the beginning of Pacelli's shift, as was required by Vane Brothers' job safety manual. *Id.* at 12-13. Further, the arbitrator found that Captain Mikus acted negligently when he failed to repair the upper deck handrails after Pacelli told him about their defects. *Id.* at 14. And the broken handrails "clearly led to [Pacelli's] decision to go down to the lower deck to spread salt." *Id.*

However, the arbitrator also found that "it was not a reasonable exercise of ordinary care for [Pacelli] to descend to the lower deck." *Id.* at 16. He explained that Pacelli "knew that the only thing that could prevent his slipping and falling and potentially drowning was a grab rail that was not reliable or accessible." *Id.* Further, the arbitrator noted that Pacelli could have asked for

5

help in three ways: (1) "he could have called the tugboat that was in the notch of the barge to ask for assistance"; (2) "he could have gone back to the living quarters of the barge, woken up Capt. Mikus and asked for his instructions and assistance"; and (3) "he could have simply waited until the additional crew arrived in the morning, alerted them before they arrived on board about the dangerous ice conditions and requested their assistance." *Id.* The arbitrator thus concluded that Pacelli was "70% negligent for not seeking assistance." *Id.* at 17. Since Vane Brothers was responsible for only 30% of the total award, Pacelli effectively won $296,025. *Id.* at 25.

**C. Procedural History**

On November 10, 2020, Pacelli filed his Petition seeking vacatur of the arbitration award. In support of this petition, he also filed a motion to vacate arbitration, Dkt. 4, a memorandum of law in support of his motion, Dkt. 5 ("Motion"), and a declaration from his attorney, Martin P. Skolnick, Skolnick Decl., which includes key exhibits from the arbitration proceeding. Because Pacelli styled his motion as one for summary judgment, he also filed a statement pursuant to Local Civil Rule 56.1. Dkt. 7. On January 8, 2021, Vane Brothers filed an opposition to Pacelli's Petition and his motion to vacate the arbitration award. Dkt. 17 ("Opposition").

On June 25, 2021, the Court entered a stipulation signed by both parties that indicated that Pacelli's motion would be deemed to include an alternative request for confirmation of the arbitration award. Dkt. 21. The stipulation required Vane Brothers to file any response or objection to Pacelli's request for alternative relief by July 2, 2021. *Id.* at 2. Vane Brothers did not file a response, and the Court understands that Vane Brothers does not oppose this request.

## II. Legal Standard

When reviewing an arbitration award under the Federal Arbitration Act ("FAA"), 9 U.S.C § 1 *et seq.*, a court "can confirm and/or vacate the award, either in whole or in part.'" *Scandinavian*

*Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006)). "[A]rbitral awards and the arbitral process" deserve "strong deference." *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007).

"Under the FAA, courts may vacate an arbitrator's decision 'only in very unusual circumstances.'" *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 568 (2013) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)). Pursuant to section 10(a) of the FAA, a district court may vacate an arbitration award on four grounds. 9 U.S.C. § 10(a). Two are relevant here. First, a court may vacate an award "when there was evident partiality or corruption in the arbitrators." *Id.* § 10(a)(2). Second, a court may vacate an award "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." *Id.* § 10(a)(3).

In addition to the bases set forth in the FAA, in this Circuit, "an arbitration award may also be vacated based on the judicially-created doctrine of 'manifest disregard of the law.'" *Interdigital Commc'ns Corp. v. Samsung Elecs. Co.*, 528 F. Supp. 2d 340, 354 (S.D.N.Y. 2007) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir. 1986)); *accord Seneca Nation of Indians v. New York*, 988 F.3d 618, 625 (2d Cir. 2021). "An arbitral award may be vacated for manifest disregard only where a petitioner can demonstrate 'both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the case.'" *Porzig*, 497 F.3d at 139 (quoting *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004)). Thus "[t]o vacate for manifest disregard, the Court must identify 'something beyond and different

7

from a mere error in the law or failure on the part of the arbitrator[] to understand or apply the law.'" *Walton Ave. Assocs., LLC v. Bragg as Trustee of 32 BJ N. Health Fund*, No. 19 Civ. 10245 (LAP), 2020 WL 6807353, at *3 (S.D.N.Y. Nov. 18, 2020) (quoting *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 208 (2d Cir. 2002)). In other words, "the award should be enforced, despite a court's disagreement with it on the merits, if there is a *barely colorable justification* for the outcome reached." *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) (internal quotation marks omitted).

These stringent standards show that in order to obtain vacatur of an arbitration decision, a petitioner "must clear a high hurdle." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). A petition to vacate an arbitration award is "not an occasion for *de novo* review of an arbitral award," but instead is "severely limited so as not to frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Scandinavian Reinsurance Co.*, 668 F.3d at 71-72 (internal quotation marks and citations omitted).

Confirming an arbitration award is much easier. Under section 9 of the FAA, "a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008) (quoting 9 U.S.C. § 9). "Normally, confirmation of an arbitration award is 'a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.'" *D.H. Blair & Co.*, 462 F.3d at 110 (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)).

### III. Discussion

### A. Vacatur of the Arbitration Award

Pacelli argues that the arbitration award here must be vacated for three reasons. None of Pacelli's arguments carry the day.

8

### 1. Manifest Disregard

First, Pacelli contends that the arbitrator acted in "manifest disregard of the law." Motion at 15-23. While he styles this as two separate arguments, they are essentially two sides of the same coin. Pacelli argues that the arbitrator erred when he reduced Pacelli's award by 70%. *Id.* at 15-22. And Pacelli says that the arbitrator erred by concluding that Vane Brothers was only "slightly" negligent. *Id.* at 22-23 (quoting Award at 17). The problem for both of these points is that Pacelli fails to identify a "governing legal principle" that the arbitrator "refused to apply" or "ignored." *Porzig*, 497 F.3d at 139 (quoting *Wallace*, 378 F.3d at 189).

In Pacelli's view, the arbitrator manifestly disregarded the law when he concluded that Pacelli should have sought assistance from either the tugboat crew, Captain Mikus, or the new crew arriving the following morning. *See* Motion at 17 ("[T]he decision reducing Pacelli's Award failed to cite any evidence that any of these options were viable options, available to Pacelli, which would have enabled him to avoid his injury."); *id.* at 21 ("The governing legal principles, including the need to inquire . . . whether an alternative option was available in order to establish contributory negligence . . . were ignored in the Arbitrator's Final Award decision."). And, Pacelli says, the arbitrator further disregarded the law by ignoring that Vane Brothers' needed "to prove causation," *i.e.*, that Pacelli's "fault contributed to his injury." *Id.* Pacelli also points to several pieces of evidence for support of his position that Vane Brothers was more than "slightly" negligent, including that the lower deck handrails were partially inaccessible, and that Vane Brothers continued operations when the rest of New York Harbor had shut down. *Id.* at 22-23. While Pacelli recognizes that the arbitrator "undeniably had broad discretion to weigh the evidence as he saw fit in reaching his decision," Pacelli contends that the arbitrator did not have "unlimited license to ignore entire[] evidence of obvious critical importance." *Id.* at 23.

9

There was no manifest disregard of the law here. Instead, the arbitrator applied the principle of contributory negligence to the facts at hand and concluded that Pacelli and Vane Brothers were both partially responsible for Pacelli's injuries. After concluding that Vane Brothers' personnel acted negligently, the arbitrator explained why, in his view, Pacelli was also negligent. Specifically, he noted that "[a]ny reasonable observer would know that walking on ice on a [narrow] stretch of ship hull in the middle of New York harbor in freezing temperatures and in darkness is likely to result in serious injury or death" and that "it was an act of additional carelessness if not recklessness for [Pacelli] to go down and attempt to salt that deck in these conditions without first seeking assistance." Award at 15-16.

Pacelli attempts to persuade this Court that the arbitrator should not have reduced Pacelli's award as he did based on the evidence presented. *See* Motion at 15 ("[T]he draconian result [the arbitrator] inflicted on the conscientious seaman was not supported by the evidence."). However, "the Second Circuit does not recognize manifest disregard of the evidence as proper ground for vacating an arbitrator's award." *Wallace*, 378 F.3d at 193 (internal quotation marks omitted). And even if the Court agreed with Pacelli on the merits of the contributory negligence question (and it is not saying that it does), this would not be enough to vacate arbitration. *Id.* at 190 ("A federal court cannot vacate an arbitral award merely because it is convinced that the arbitration panel made the wrong call on the law. On the contrary, the award 'should be enforced, despite a court's disagreement with it on the merits.'" (quoting *Banco de Seguros del Estado v. Mut. Marine Off., Inc.*, 344 F.3d 255, 260 (2d Cir. 2003))); *E.I. Dupont De Nemours & Co. v. Jo Tankers, B.V.*, 172 F. Supp. 2d 405, 408 (S.D.N.Y. 2001) ("The review of an arbitration award for manifest disregard of the law is not an inquiry into the correctness of the decision or a determination of whether the court would have reached the same conclusion.").

Moreover, the Second Circuit has made clear that a court should not vacate an arbitration award because of "a simple error in law or a failure by the arbitrators to understand or apply it." *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 78 (2d Cir. 2011) (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003)). Instead, vacatur is only appropriate "when a party clearly demonstrates 'that the [arbitrator] intentionally defied the law." *Id.* (quoting *Duferco*, 333 F.3d at 393); *accord Walton Ave. Assocs., LLC*, 2020 WL 6807353, at *4. Pacelli has made no showing that this occurred here.

This Court must refrain from vacating an arbitration award "if there is a *barely colorable justification* for the outcome reached." *T.Co Metals, LLC*, 592 F.3d at 339 (internal quotation marks omitted). Here, there is. The arbitrator found that both Vane Brothers and Pacelli were negligent in part and relied on evidence in the record to reach his conclusion. *See* Award at 12-17. That the arbitrator did not agree with Pacelli that Vane Brothers alone was responsible for his injuries is not a ground that meets the "high hurdle" justifying vacatur. *Stolt-Nielsen S.A.*, 559 U.S. at 671.

**2. Evident Partiality**

Second, Pacelli points to 9 U.S.C. § 10(a)(2) and argues that vacatur is warranted because there was "evident partiality . . . in the arbitrator." Motion at 27 (internal quotation marks omitted). "Evident partiality may be found only 'where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.'" *Scandinavian Reinsurance Co.*, 668 F.3d at 64 (quoting *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007)). But vacatur is not required "whenever an undisclosed relationship is discovered." *Certain Underwriting Members of Lloyds of London v. Fla., Dep't of Fin. Servs.*, 892 F.3d 501, 506 (2d Cir. 2018) (quoting *Lucent Techs. Inc. v. Tatung Co.*, 379 F.3d 24, 30 (2d

11

Cir. 2004)). Instead, "[i]t is 'the materiality of the undisclosed conflict [that] drives a finding of evident partiality, not the failure to disclose or investigate *per se*.'" *Id.* (quoting *Nat. Indem. Co. v. IRB Brasil Resseguros S.A.*, 164 F. Supp. 3d 457, 476 (S.D.N.Y. 2016)).

Pacelli does not argue that the arbitrator here failed to disclose a material relationship or even that "a reasonable person would have to conclude that [the] arbitrator was partial." *Scandinavian Reinsurance Co.*, 668 F.3d at 64. Instead, he contends that the arbitrator "create[d] an appearance of bias" when he disclosed his ownership interest in JAMS on December 5, 2019 and JAMS's involvement with several other cases involving Vane Brothers or Vane Brothers' counsel's law firm on December 6, 2019. Motion at 24. This argument readily fails.

The arbitrator here made the disclosures at issue in December 2019. *See* Skolnick Decl., Exhs. M-N. Although this followed the arbitration hearing, it occurred more than eight months before the arbitrator rendered his final decision. *See* Award at 26. Pacelli concedes that he never raised this issue of alleged partiality during the arbitration. Motion at 26-27. But he says that the Court should look past this because doing so could have "antagonized" the arbitrator and "[i]t would not have been easy for [him] to start over" with a new arbitration. Motion at 27.

Looking past the fact that Pacelli now asks the Court to do just that (set aside the arbitration so he can start over), his argument fails as a matter of law. "Where a party has knowledge of facts possibly indicating bias or partiality on the part of an arbitrator he cannot remain silent and later object to the award of the arbitrators on that ground. His silence constitutes a waiver of the objection." *AAOT Foreign Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 139 F.3d 980, 982 (2d Cir. 1998) (internal quotation marks omitted); *accord Rai v. Barclays Cap. Inc.*, 739 F. Supp. 2d 364, 374 (S.D.N.Y. 2010) ("[Petitioner] cannot remain silent about the perceived partiality, and later object when the [arbitrator] reaches a decision he dislikes. His

silence constitutes a waiver of his right to object on those grounds."). If Pacelli had an issue with the disclosures made in December 2019, he was required to raise the issue to the arbitrator prior to the arbitrator's decision, which was not even issued until more than eight months after the disclosures. Because he did not, Pacelli waived this argument.

But even if he did not, it would still fail. For support of his position, Pacelli relies primarily on *Monster Energy Co. v. City Beverages, LLC*, 940 F.3d 1130 (9th Cir. 2019). There, Monster Energy Co. ("Monster") and one of its distributors arbitrated a dispute. *Id.* at 1132-33. The distributor lost and sought to vacate the arbitration award because it later learned that the arbitrator had not disclosed that he was a co-owner of JAMS. *Id.* The distributor argued this amounted to "evident partiality" under section 10(a)(2) of the FAA. *See id.* The district court denied vacatur and confirmed the award, but the Ninth Circuit reversed. *Id.* at 1138-39. The Ninth Circuit noted that "over the past five years, JAMS ha[d] administered 97 arbitrations for Monster: an average rate of more than one arbitration per month." *Id.* at 1136. The Ninth Circuit reasoned that although the arbitrator had disclosed his economic interest in JAMS generally, *id.*, his "failure to disclose his ownership interest in JAMS—given its nontrivial business relations with Monster—create[d] a reasonable impression of bias and support[ed] vacatur of the arbitration award." *Id.* at 1138.[1]

*Monster Energy Co.* is distinguishable for several reasons. First, in that case, the arbitrator "did *not* . . . disclose his ownership interest in JAMS and JAMS's substantial business relationship

---

[1] It bears mentioning that four Ninth Circuit judges have expressed reservations about whether *Monster Energy* was correctly decided. *See Monster Energy Co.*, 940 F.3d at 1139-43 (Friedland, J., dissenting); *EHM Prods., Inc. v. Starline Tours of Hollywood, Inc.*, -- F.4th --, No. 20-55426, 2021 WL 2584404, at *10 (9th Cir. 2021) (VanDyke, J., with Gould, Lee, JJ., concurring) (encouraging the Ninth Circuit "to reconsider *Monster Energy* en banc"). And at least one district court has also noted that *Monster Energy* "appears to be at odds" with Third Circuit precedent. *Martin v. NTT Data, Inc.*, No. 20 Civ. 686, 2020 WL 3429423, at *7 (E.D. Pa. June 23, 2020) (citing *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240 (3d Cir. 2013)).

with Monster." *Id.* Here, the arbitrator disclosed his ownership interest in JAMS and the organization's other work with Vane Brothers. *See* Skolnick Decl., Exhs. M-N. Although these disclosures occurred after the hearing, all parties had this information more than eight months before the arbitrator's final decision. Second, *Monster Energy* recognized that vacatur was justified in part because, in that court's view, administering nearly 100 arbitrations for one of the parties was "hardly trivial." 940 F.3d at 1136. Here, Pacelli recognizes that "the total number of cases JAMS ha[d] with Vane [Brothers], its attorney and its law firm [was] less than the number cited in *Monster Energy*." Motion at 25. Indeed, JAMS had only six with Vane Brothers, two with Vane Brothers' counsel, and seven with Vane Brothers' counsel's law firm, *see* Skolnick Decl., Exh. N, nowhere near the 97 arbitrations at issue in *Monster Energy*. Pacelli says that such single-digit numbers are "still non-trivial." Motion at 25. The Court is not convinced.

Finally, Pacelli seems to assume that the arbitrator's partial ownership of JAMS and JAMS's business relations with Vane Brothers are alone enough to establish evident partiality. But the Second Circuit has made clear that "[i]t is the materiality of the undisclosed conflict [that] drives a finding of evident partiality, not the failure to disclose or investigate *per se*." *Certain Underwriting Members of Lloyds of London*, 892 F.3d at 506 (alteration in original) (internal quotation marks omitted). In this Circuit, there must be "a showing of something more than the mere 'appearance of bias' to vacate an arbitration award." *Id.* at 507 (internal quotation marks omitted). A court should not "vacate arbitration awards for evident partiality when the party opposing the award identifies no direct connection between [the arbitrator] and the outcome of the arbitration." *Id.* (alternation in original) (internal quotation marks omitted). Pacelli makes no showing that the arbitrator's ownership interest in JAMS or Vane Brothers' business dealings with JAMS were material or connected to the ultimate outcome of the arbitration.

Alternatively, Pacelli argues that the arbitrator's "partiality is also abundantly clear from the final Award itself." Motion at 28. Pacelli cites no authority for the idea that an award on its face can demonstrate evident partiality. Even so, Pacelli's issue is not with the amount of the award, but rather with the proportions that the arbitrator assigned to him and Vane Brothers. Thus, Pacelli is actually asking this Court to determine *de novo* that Vane Brothers should be responsible for a greater percentage of the total award. This, the Court cannot do. *Wallace*, 378 F.3d at 189 ("A motion to vacate filed in a federal court is not an occasion for *de novo* review of an arbitral award.").

The arbitrator here did not exhibit evident partiality, and therefore the Court will not vacate the award pursuant to section 10(a)(2) of the FAA.

### 3. "Extraordinary Delays"

Pacelli also says that "[t]he Arbitrator's delay in rendering his decision in this case was extraordinary," citing the arbitrator's several requested extensions, which together caused the final decision to be rendered more than six months after it was originally due under the JAMS Rules. Motion at 28. Pacelli argues that this delay amounted to "misbehavior by which the rights of [a] party have been prejudiced." *Id.* at 31 (quoting 9 U.S.C. § 10(a)(3)).

Pacelli relies on two cases for this argument, neither of which support his position. First, he points to *Tempo Shain Corp. v. Bertek, Inc.*, in which the Second Circuit held that an arbitration panel's "refusal to continue the hearings to allow" a certain individual "to testify amount[ed] to fundamental unfairness and misconduct sufficient to vacate the award pursuant to section 10(a)(3) of the FAA." 120 F.3d 16, 21 (2d Cir. 1997). *Tempo Shain Corp.* says nothing about an arbitrator requesting extensions of the deadline to file the final decision. Pacelli also cites *Whitehead v. Pullman Group, LLC*, 811 F.3d 116 (3d Cir. 2016), but this case fares even worse for him. There,

15

the Third Circuit affirmed the district court's decision to *deny* a motion to vacate an arbitration award and held that the arbitrator did not err in refusing to hear certain testimony. *Id.* at 120. Neither of these cases have anything to do with a delayed final arbitration decision. Pacelli thus points to no authority to support his position that the arbitrator's extension requests amounted to "misbehavior" by the arbitrator such that Pacelli's rights were prejudiced, especially when Pacelli consented to the extensions. And the Court is aware of none. This argument lacks all merit.

### 4. Prejudgment Interest

Finally, Pacelli argues that the Court should vacate the arbitration award because the arbitrator failed to award him prejudgment interest. Motion at 32-34; *see* Award at 24 ("The Claimant's requests for awards of interest are denied pursuant to JAMS Comprehensive Arbitration Rules & Procedures, Rule 24(g)."). While Pacelli cites authority that would allow an arbitrator to grant him prejudgment interest, he fails to point the Court to any case in which a district court vacated an arbitration award for failure to award prejudgment interest.

Courts "have rejected motions to vacate or modify arbitration awards which have failed to provide prejudgment interest." *Shamah v. Schweiger*, 21 F. Supp. 2d 208, 217 (E.D.N.Y. 1998); *accord Moran v. Arcano*, No. 89 Civ. 6717 (CSH), 1990 WL 113121, at *2 (S.D.N.Y. July 27, 1990). When an arbitrator decides "on the merits, not to award prejudgment interest . . . courts are loath to disturb the ruling of an arbitrator." *Norwest Corp. v. Vulcan Cap. Mgmt., Inc.*, No. 06 Civ. 6342 (LAP), 2008 WL 11516925, at *1 (S.D.N.Y. Oct. 7, 2008). The Court thus declines to vacate the arbitration award on this ground.

## B. Confirmation of the Arbitration Award

Having concluded that the arbitration award should not be vacated pursuant to section 10(a) of the FAA, the Court turns to Pacelli's request for alternative relief: confirmation of the arbitration

award pursuant to section 9 of the FAA. *See* Dkt. 21 at 2. As discussed above, the Court "must" grant this relief "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11" of the FAA. 9 U.S.C. § 9.

Here, Pacelli's petition to confirm the award is unopposed, so the Court treats it as an unopposed motion for summary judgment. *See D.H. Blair & Co.*, 462 F.3d at 110. Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Court sees no reason to set aside the award here. As discussed at length above, "[t]here is no evidence in the record that the award was procured by corruption, fraud, or undue means; that . . . the arbitrator[] [was] partial or corrupt; that the arbitrator[] [was] guilty of any misbehavior prejudicing the rights of any party; that the arbitrator[] exceeded or imperfectly executed [his] power[]; or that there was a manifest disregard of the law." *Clearwater Ins. Co. v. Granite State Ins. Co.*, No. 15 Civ. 165 (RJS), 2015 WL 500184, at *2 (S.D.N.Y. Feb. 5, 2015). Pacelli was bound to arbitrate his claims, *see* Skolnick Decl., Exh. F at 3, and there is sufficient evidence in the record to support confirmation of the award, *see* Award at 3-24. Pacelli's unopposed petition to confirm the award is granted.

### IV. Conclusion

For the reasons stated, Pacelli's petition to vacate the arbitration award is denied, and his petition to confirm the arbitration award is granted. The Clerk of Court is respectfully directed to terminate all pending motions and close this case.

SO ORDERED.

Dated: July 16, 2021
New York, New York

                                         JOHN P. CRONAN
                                      United States District Judge